## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **IVY BRIDGE, ET AL.,** | **MEMORANDUM DECISION AND ORDER** |
| **Plaintiffs,** | |
| vs. | Case No. 2:21-cv-495-DAK-DAO |
| **NATURE'S SUNSHINE PRODUCTS, INC.,** | Judge Dale A. Kimball |
| **Defendant.** | Magistrate Judge Daphne A. Oberg |

This matter is before the court on Defendant Nature's Sunshine Products, Inc.'s ("NSP") Motion to Dismiss or to Stay Litigation and Compel Arbitration [ECF No. 12]. On January 13, 2022, the court held a hearing on the motion. At the hearing, Michael S. Popok represented Plaintiff and Christopher Martinez represented Defendant. The court took the motion under advisement. After carefully considering the memoranda filed by the parties and the law and facts relevant to the pending motion, the court issues the following Memorandum Decision and Order.

## BACKGROUND

NSP has manufactured and distributed herbal supplements since 1972, using a multilevel marketing model. NSP uses non-exclusive independent distributors/consultants, who market, sell, and distribute NSP's products to their customers. Plaintiffs are twenty long-time consultants/distributors who began working as NSP consultants/distributors between 1973 and 1996. NSP refers to Plaintiffs as Consultants, but Plaintiffs refer to themselves as Distributors. NSP previously called their Consultants "Members" or "Independent Distributors," but NSP's current documents refer to such individuals as "Consultants." The court will refer to them as

1

Plaintiffs and use the term "Consultants" as necessary, given that the operative documents refer to "Consultants."

NSP made changes to its multilevel marketing model to move more toward a retail "direct sales to consumers" model in September 2020.   Plaintiffs allege that these changes to the marketing and compensation plans breach oral promises that NSP made to them decades ago. Based on these changes, Plaintiffs brought this lawsuit against NSP, alleging claims for promissory estoppel, unjust enrichment, breach of oral contract, breach of the implied covenant of good faith and fair dealing, and intentional interference with prospective economic advantage.

NSP responded to the lawsuit by bringing the present motion to dismiss and compel arbitration.   NSP contends that its relationship with each of its consultants is contractual and governed by the Membership Agreement, which is comprised of three documents: the Consultant Application, the NSP Compensation Plan, and the NSP Policies and Procedures.   The arbitration provision at issue in the present motion is contained in Section 15 of NSP's Policies and Procedures and applies to "any legal cause of action arising out of or relating to the Membership Agreement."

NSP's Compensation Plan defines a "Consultant" as an individual "who has accepted the terms and conditions of the Membership Agreement."  And the Membership Agreement is defined as the "binding contract between the Consultant and NSP.  It governs the Consultant's membership and includes the Consultant Application, the NSP Compensation Plan, and the NSP Policies."  Section 14.1 of the Policies states that memberships are active for one year and Consultants must renew each year.  NSP's Policies and Procedures are available online.

NSP's Policies and Procedures state that in order to be paid income pursuant to the Compensation Plan, the Consultant agrees to be bound by the Policies and Procedures.   The

Policies and Procedures state that "Consultants understand and agree to be bound by the most current versions of these Policies, the NSP Compensation Plan, and the other documents forming the Membership Agreement, including any revisions or amendments made after the date of the Consultant's enrollment, upon the occurrence of any of the following: . . . (b) renewing a Membership; (c) enrolling a new Consultant; or (d) accepting any commissions or other payments from NSP under the NSP Compensation Plan."   The Policies and Procedures further state that "by purchasing products from NSP for purposes of resale, the independent Consultant agrees to adhere to the terms and conditions contained in the Compensation Plan, as well as all provisions in these Policies.   It is the responsibility of each Consultant to read, understand, follow and ensure that he/she operates his/her independent NSP business under the most current version of these documents, including any amendments."

Consultants must renew their memberships and agree to the new terms every year, when they recruit new consultants, and when they get paid by NSP.   The Consultants in this case were paid in accordance with the Membership Agreement's Compensation Plan, continued to accept compensation after the Policies included an arbitration provision, and have not returned any of the payments that NSP paid on the condition that the Consultants agree to comply with the NSP Policies.

Plaintiffs, however, claim that their relationships with NSP are not pursuant to any written or signed agreement and that NSP inconsistently defines the term "Membership Agreement" in its documents and NSP's motion.   Section 1.1 of the NSP Policies and Procedures defines the "Membership Agreement" as comprised of the Consultant Application, the NSP Compensation Plan, and the NSP Policies and Procedures.   Whereas Section 1.4 of the NSP Policies and Procedures also states that the "Membership Agreement" includes the NSP Compensation Plan,

the NSP Policies and Procedures, and "other documents forming the Membership Agreement." Plaintiffs argue that NSP has not submitted evidence that any Plaintiff "completed the Consultant Application" or "entered into the Membership Agreement."

The parties also dispute whether Plaintiffs had notice of the arbitration provision. Plaintiffs assert that NSP never specifically notified them that it had added the arbitration provision to the Policies and Procedures and that NSP never sent a written copy of the Policies and Procedures to them.   NSP states that it sent an email to each Plaintiff on September 1, 2020, containing a link to an electronic version of the new NSP Policies and Procedures.   NSP claims that Plaintiffs cannot participate in the Compensation Plan unless they accept the Policies and Procedures, that Plaintiffs agreed to be bound by any updates to the Policies and to conduct their business in accordance with the most current version of the Policies, and acceptance of compensation is acceptance of the Policies.

NSP also states that at the time it made changes to its compensation model in September 2020, it offered many of its Consultants, including all of the Plaintiffs in this action, the opportunity to continue to earn the same compensation for at least one additional year.   NSP sent Plaintiffs a letter outlining this "Partnership Pathway."   Under the Partnership Pathway, NSP would calculate each of the Plaintiff's average monthly income from October 2019 through April 2020 (excluding March 2020), and that average amount would be set as each Plaintiff's minimum monthly benefit ("Bridge Payments") from September 2020 through August 2021. To receive Bridge Payments, Plaintiffs had to meet a number of conditions set forth in the letter.   One of these express conditions was to comply with NSP's Policies and Procedures.   Those Policies and Procedures include the arbitration clause.   Each of the Plaintiffs in this case received Bridge Payments.   None of the Plaintiffs rejected or returned the Bridge Payments and none of the

Plaintiffs rejected the terms to which they received Bridge Payments.

In support of its motion, NSP filed the Declaration of Erick Ampuero, its Global Manager of Distributor Education and Compliance, which explains NSP's Membership Agreement, Compensation Plan, Policies and Procedures, and NSP's communications with its Consultants. Plaintiffs have not submitted declarations from any of the twenty Plaintiffs to testify that they were not aware of the Policies, the updates to the Policies, or the arbitration provision.

## DISCUSSION

### NSP's Motion to Dismiss or Stay

Pursuant to the arbitration agreement in Section 15 of NSP's Policies, NSP seeks dismissal of this action for improper venue or a stay and order compelling arbitration.   Under the Federal Arbitration Act ("FAA"), "[a] written provision in . . . a contract evidencing a transaction involving [interstate] commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."   9 U.S.C. § 2.   Therefore, a court must order arbitration as long as (1) the parties have agreed to arbitrate and (2) the dispute falls within the scope of the agreement.   In this case, Plaintiffs do not dispute that their claims would fall within the arbitration provision in Section 15 of NSP's Policies.   Plaintiffs only dispute whether there is an agreement to arbitrate in the first place.

Federal courts have repeatedly recognized that there is a "liberal federal policy favoring arbitration."   *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).  However, "the question 'whether parties have a valid arbitration agreement at all' is a 'gateway matter' that is 'presumptively for courts to decide.'"   *Bellman v. i3Carbon, LLC*, 563 Fed. Appx. 608, 611 (10th Cir. May 29, 2014) (citations omitted).   "[W]hen the dispute is whether

there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away." *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998). "Whether an agreement to arbitrate exists 'is simply a matter of contract between the parties.'" *Bellman*, 563 Fed. Appx. at 612 (citations omitted); *see also Spahr v. Secco*, 330 F.3d 1266, 1269 (10th Cir. 2003)("arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit."). Accordingly, courts "'apply ordinary state-law principles that govern the formation of contracts to determine whether a party has agreed to arbitrate a dispute.'" *Bellman*, 563 Fed. Appx. at 612 (citations omitted).

Under Utah law, "arbitration agreements 'must be contained in a written document setting forth the scope of the dispute to be arbitrated.'" *Campbell Investments, LLC v. Dickey's Barbecue Restaurants, Inc.*, 784 Fed. Appx. 627, 631 (10th Cir. Sept. 6, 2019) (quoting *Pac. Dev. L.C. v. Orton*, 23 P.3d 1035, 1039 (Utah 2001)). This requirement is similar to the FAA's requirement of a "written provision . . . to settle by arbitration a controversy thereafter arising out of such contract or transaction.'" *Id.* (quoting 9 U.S.C. § 2).

If there are genuine issues of material fact regarding the parties' agreement to arbitrate, the dispute should proceed summarily to trial. *Bellman*, 563 Fed. Appx. at 612. But "'[w]hen it's apparent . . . that no material disputes of fact exist it may be permissible and efficient for a district court to decide the arbitration question as a matter of law through motions practice and viewing the facts in the light most favorable to the party opposing arbitration.'" *Id.* (quoting *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 977 (10th Cir. 2014)). "In ascertaining whether questions of material fact remain," courts "give the nonmoving party—here, Plaintiffs—'the benefit of all reasonable doubts and inferences that may arise.'" *Id.* (quoting *Hancock v. AT&T*

6

*Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012)).  "[T]he framework for analyzing this issue 'is similar to summary judgment practice': the party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement; if it does so, the burden shifts to the nonmoving party to raise a genuine dispute of material fact regarding the existence of an agreement."  *Id.*  (quoting *Hancock*, 701 F.3d at 1261).

Accordingly, in this case, NSP bears the burden of demonstrating the existence of an enforceable arbitration agreement.   If it does so, Plaintiffs then have the burden of raising a disputed material fact regarding the existence of an agreement.

NSP argues that Plaintiffs agreed to arbitrate because each of the Plaintiffs are subject to the arbitration provision in NSP Membership Agreement.   However, the Membership Agreement is not a simple contract that NSP discussed and entered into with each Plaintiff.   The Membership Agreement is made up of three documents—the Consultant Application, the NSP Compensation Plan, and the NSP Policies and Procedures.   To support its contention that Plaintiffs agreed to the arbitration provision in the NSP Policies and Procedures, NSP submitted the Declaration of Erick Ampuero, the Global Manager of Distributor Education and Compliance for NSP.   His declaration explains that Consultants, such as Plaintiffs, are paid pursuant to NSP's Compensation Plan and the Compensation Plan defines a "Consultant" as an individual "who has accepted the terms and conditions of the Membership Agreement."   The "Membership Agreement" is defined as the "binding contract between the Consultant and NSP.   It governs the Consultant's membership and includes the Consultant Application, the NSP Compensation Plan, and the NSP Policies."   The NSP Policies include the arbitration clause.   Consultants can only participate in the Compensation Plan if they accept the NSP Policies, which are posted on the NSP website and updated periodically,   Consultants agree to be bound by any updates to the Policies, and to accept

those updates each time they renew their membership, enroll a new member, or accept commissions or payments from NSP.   Each Consultant agrees that they will read, understand, and conduct their business in accordance with the most current version of the Policies.   Each of the Plaintiffs has accepted monthly payments from NSP for years, in accordance with the Membership Agreement's Compensation Plan, and have never returned any payments.   Plaintiffs continued to accept payments from NSP after the changes to the Policies and Compensation Plan went into effect.

Despite Plaintiffs' claim about the lack of an agreement, the Membership Agreement is consistently defined in multiple places throughout the parties' governing documents, which establish the terms and conditions upon which NSP allows Consultants to purchase or resell NSP products, recruit additional Consultants, or receive commissions.   However, Plaintiffs are receiving the benefits from those exact agreements.   Moreover, Plaintiffs are frequently required to renew their membership and they are charged with learning and implementing the updated policies within their organization.   There is no evidence before the court to support Plaintiffs' assertion that their relationships with NSP are not governed by these operating documents.

Plaintiffs contend that NSP has failed to proffer evidence that there is a valid and enforceable agreement to arbitrate that was (1) sent to and received by Plaintiffs (3) signed or acknowledged by each Plaintiff (4) and that conspicuously informed each Plaintiff of the arbitration agreement and Plaintiffs' waiver of their right to a jury trial.   However, NSP submitted the Ampuero Declaration testifying that the Policies and Procedures were emailed to each of the Plaintiffs.   Plaintiffs argue that NSP has not proven they received the email.   But Plaintiffs did not submit a declaration stating that they did not receive the Policies and Procedures or otherwise rebut the Ampuero Declaration.   There is no requirement, nor should there be in this day and age,

that an agreement be mailed in paper form.   Plaintiffs were obviously aware of the changes in the

documents NSP emailed them on September 1, 2021—they are suing based on those changes.

NSP also provided evidence that they sent an email to Plaintiffs regarding the Bridge Payments,

which also required Plaintiffs to abide by the Policies.   Plaintiffs were sufficiently notified of the

arbitration provision.   The Consultants have consented to receiving notice of any amendments or

updates to the Policies through NSP's website, emails, and newsletter.   They have also agreed to

read and follow those updated provisions in order to ensure that their operations and downlines are

in compliance.   Therefore, NSP has provided adequate evidence that Plaintiffs received the

emails.   Whereas Plaintiffs have made only unsupported assertions in response.

Plaintiffs did not sign the arbitration agreement, but there is no requirement under Utah law

or the FAA, that an arbitration agreement be signed.   *Medical Dev. Corp. v. Industrial Molding*

*Corp.*, 479 F.2d 345, 348 (10th Cir. 1973).   The only requirement is that the agreement be in

writing.   *Id.*   The arbitration provision in this case is in writing.   Federal courts have recognized

that "[g]eneral contract principles can validate an unsigned agreement to arbitrate." *TransAsia*

*Lawyers v. EcoNova, Inc.*, Civ.No. 1:13-CV-98-DN, 2014 WL 2112442, *6 (D. Utah May 20,

2014).   "[A] party can agree to submit to arbitration by means other than personally signing a

contract containing an arbitration clause." *Internat'l Paper Co. v. Schwabedissen*, 206 F.3d 411,

416 (4th Cir. 2000).   Likewise, "[a] nonsignatory is estopped from refusing to comply with an

arbitration provision "when it receives a 'direct benefit' from a contract containing an arbitration

clause." *Id.* at 417-18.

In *Schwabedissen*, a company purchased an industrial saw from a manufacturer, using a

purchase order that incorporated the manufacturer's "General Conditions," a separate document

that contained a broad international arbitration provision.   *Id.* at 414.   A subsequent entity

acquired the purchaser through bankruptcy, sought to enforce the purchase order, but argued that it could not be bound by the arbitration provision because it had not signed the arbitration provision. *Id.* The Fourth Circuit disagreed, stating that "[i]n the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him." *Id.* at 417. "To allow a plaintiff to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purpose underlying enactment of the Arbitration Act." *Id.*

The court's decision in *TransAsia Lawyers* makes a similar point. In that case, a law firm sent a nine-page document to a client, detailing its billing practices and terms of service. 2014 WL 2112442, at *2. The letter contained an arbitration provision but did not require the client to sign it. *Id.* Instead, the letter said: "If we do not hear from you within 5 business days of receipt of our Engagement Letter but continue to receive instructions from you or your representatives on the matter in question, then your acceptance of the agreement set forth in the Engagement Letter [inclusive of these terms) shall be deemed to have been given." *Id.* at *2. A dispute later arose between the parties, and the client argued that it was not subject to arbitration because it had never signed the agreement. *Id.* at *4. The court, however, disagreed, finding that the client's "failure to contest the arbitration clause combined with its subsequent instructions to TransAsia to provide legal services rendered the agreement enforceable." *Id.* at *7.

The same principle applies here. Plaintiffs contracted to become NSP Consultants, who are required to abide by NSP Policies. The Policies make clear that if Plaintiffs want to participate in the business relationship, then they need to abide by the current version of the Policies. Each

Consultant reaffirms that obligation every time they renew their annual membership, recruit new

Consultants, or accept commissions or other payments from NSP.   Plaintiffs have done all of

those things and now seek to disregard the entire agreement to avoid their contractual obligation to

arbitrate.   Plaintiffs were also expressly notified that they needed to abide by the updated Policies

in order to receive bridge payments, and they accepted those funds without any

objection.   Plaintiffs cannot argue that they can avoid one provision of an agreement when they

are taking advantage of the other provisions of that same agreement.

The limited cases Plaintiffs rely on are distinguishable.   In *Campbell*, the Tenth Circuit

affirmed the lower court's decision and did not compel arbitration because, fundamentally, the

defendant failed to "identify a valid written agreement that expressed a mutual intention to

arbitrate" among the unsigned franchise agreement and other documents between the parties.   784

Fed. Appx. at 628.   The court emphasized that even if there was activity suggesting the existence

of some type of agreement between the parties (payment of royalties, use of proprietary marks),

the FAA mandates that agreements to arbitrate disputes must be in writing.   Further, there must be

proof that the nonmoving party assented to the written terms.   *Id.* at 632-33.   The court concluded

that a franchisor could not enforce an arbitration provision in a contract governing an Ogden

restaurant against a franchisee who purchased a South Jordan location that contained no such

provision.   784 Fed. Appx. at 628.   Unlike this case, there was clearly a lack of mutual assent in

*Campbell*.   *Campbell* did not involve a long-standing agreement between the parties requiring

them to abide by policies as a condition to earning commissions and educate the members of its

business organization as to those polices.

And, in *Bellman*, the defendant sought to enforce an arbitration clause in an unsigned

Operating Agreement that conflicted with the investor's signed Subscription Agreement that

required all disputes to be resolved by the Colorado courts.   563 Fed. Appx. at 614-15.   Here, there is no such factual discrepancy.   NSP has always required its Consultants to abide by the Membership Agreement and its Policies as a condition of purchasing/reselling products and earning commissions.   More importantly, if there is no valid agreement between these parties, then Plaintiffs have no right to be Consultants, to resell products, to recruit a sales team, or to earn commissions from any of their activities.   Plaintiffs cannot now disregard the agreement between the parties just to avoid arbitration.

Plaintiffs also rely on *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 32 (2d Cir. 2002) for the proposition that "[c]larity and conspicuousness of arbitration terms are important in securing informed consent." *Specht*, 306 F.3d at 32.   While the arbitration provision is in Section 15 of 16 sections of NSP's Policies, Plaintiffs agree to keep informed of the updates to NSP's Policies and operate their downlines in accordance with the new Policies.   Consumer cases like *Specht*, which involved a situation in which consumers download a free software program without being given notice of the license's terms, are distinguishable because they do not involve the kind of ongoing business relationships at issue in this case.   Those type of consumer cases are not helpful to the determination of mutual assent in this case.   Not a single Plaintiff has filed a declaration stating that he/she was not aware of the provision or updates to the Policies.   These communications and course of dealing were sufficient to provide notice to Plaintiffs.   Plaintiffs' lack of diligence in observing their own contractual obligations, if in fact they were not aware of the provision, does not render the contract unenforceable.

Finally, Plaintiffs argue that the court cannot rule on the motion because they claim the agreement is unconscionable.   Plaintiffs bear the burden on that issue and they have not attempted to show substantive or procedural unconscionability.   Moreover, "Utah courts routinely prevent

12

one party from claiming that a contract is invalid if they accept that contract's benefits." *Diatect Int'l Corps. v. Organic Materials Review Inst.*, No. 2:05CV465, 2007 U.S. Dist. LEXIS 16295, at *7-8, 12-13 (D. Utah Mar. 7, 2001).   "Utah courts have long held that this standard is met when one party accepts the benefit of the bargain and performs under its terms only to later question the validity of the instrument." *Id.*

All the Plaintiffs in this case have accepted the compensation benefits of the Membership Agreement for decades.   They have continued to receive those benefits during the pendency of this lawsuit. A party is estopped from avoiding an arbitration clause when the "party accepts the benefit" of the contract "only later to question the validity of the instrument." *Id.*; *see also Ellsworth v. Am. Arbitration Ass'n*, 2006 UT 77, P20, 148 P.3d 983, 989 (Utah 2006) (party is "estopped from avoiding arbitration" when party "seeks to benefit from some portions of the contract but avoid the arbitration provision"); *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1294 n.17 (10th Cir. 2017) (same).   Plaintiffs cannot receive the benefits of the Membership Agreement and avoid the arbitration clause set forth in that same Membership Agreement.

The parties agree that the court can consider evidence outside the pleadings for this type of motion and that it must draw all reasonable inferences in favor of the nonmoving party. *See IHC Health Servs. v. Eskaton Props.*, 2016 E.S. Dist. LEXIS 124848 (D. Utah Sept. 12, 2016).   Plaintiffs take issue with the declaration of Erick Ampuero, NSP's Global Manager of Distributor Education and Compliance, but Plaintiffs offer no competing declarations from any witness who is willing to state under penalty of perjury that they were not aware of the Policies, updates to Policies, or the arbitration provision.   Plaintiffs also do not deny that they have received bridge payments pursuant to the updated Policies for the last year without raising any objections to those.

Under Tenth Circuit law, the court must analyze the issue as it would on summary judgment. *Belmman*, 563 Fed. Appx. at 612. Plaintiffs' failure to submit any evidence to rebut the Ampuero Declaration precludes the court from finding that there was no agreement to arbitrate. Plaintiffs have not put any facts in dispute. The parties merely disagree as to how the court should view the facts presented in the Ampuero Declaration. The court concludes that NSP has demonstrated the existence of a valid written agreement to arbitrate, and Plaintiffs have not rebutted that evidence.

The FAA provides that if any lawsuit brought in the courts is referable to arbitration under an arbitration agreement, the court shall stay the trial of the action until such arbitration has occurred. 9 U.S.C. § 3. However, where all issues between the parties are subject to and will be resolved by arbitration, the majority of federal courts have held that a stay serves no obvious purpose and dismissal is appropriate. *Alarape v. Group 1 Auto., Inc.*, 2006 WL 2990212, at *3 n.2 (D. Colo. Oct. 19, 2006) (collecting cases and noting that Tenth Circuit has not addressed issue directly). The court, therefore, dismisses Plaintiffs' claims without prejudice to being asserted in arbitration pursuant to the terms of the Membership Agreement.

## CONCLUSION

Based on the above reasoning, Defendant Nature's Sunshine Products, Inc.'s ("NSP") Motion to Dismiss or to Stay Litigation and Compel Arbitration [ECF No. 12] is GRANTED.

DATED this 1st day of March, 2022.

BY THE COURT

DALE A. KIMBALL
United States District Judge

14